UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

GREAT AMERICAN INSURANCE COMPANY,

                      *Plaintiff*,

       -v-

GEMSTONE PROPERTY MANAGEMENT LLC,
DHNY APT IV LLC, and LUIS MANUEL GARCIA
SALCEDO,

                    *Defendants*.

------------------------------------------------------------------ X

GEMSTONE PROPERTY MANAGEMENT LLC,
DHNY APT IV LLC, and LUIS MANUEL GARCIA
SALCEDO,

                *Third Party Plaintiffs*.

       -v-

ASPEN SPECIALTY INSURANCE COMPANY,
IRONSHORE INDEMNITY INC., DISTINGUISHED
PROGRAMS INSURANCE BROKERAGE LLC,
DISTINGUISHED PROPERTIES UMBRELLA
MANAGERS INC. and THE O&S INSURANCE
BROKERAGE GROUP, INC. *c/o its successor* HUB
INTERNATIONAL LIMITED,

                *Third Party Defendants*.

------------------------------------------------------------------ X

                                     23-cv-9100 (LJL)

                                OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__8/1/2025___

LEWIS J. LIMAN, United States District Judge:

     Third-party Defendants Distinguished Programs Insurance Brokerage LLC

("Distinguished Brokerage")[1] and Distinguished Properties Umbrella Managers Inc.

---

[1] Distinguished Programs Insurance Brokerage LLC is referred to in the Third-Party Complaint
and throughout TPPs' papers as "Distinguished Programs." The parent company of
Distinguished Programs Insurance Brokerage LLC is Distinguished Programs Group, LLC,

("Distinguished Properties" and, with Distinguished Brokerage, the "Distinguished Parties")
move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the third-party claims
against them by Third-Party Plaintiffs Gemstone Property Management LLC ("Gemstone"),
DHNY APT IV LLC ("DHNY"), and Luis Manuel Garcia Salcedo ("Salcedo" and, together with
Gemstone and DHNY, the "TPPs"). Dkt. No. 123. By order of April 18, 2025, the Court gave
notice that it might treat the motion as one for summary judgment and provided an opportunity
for TPPs to present additional material. Dkt. No. 157. TPPs did not provide additional material.
The Court converts the motion to one for summary judgment and, for the reasons that follow,
grants summary judgment in favor of the Distinguished Parties and dismisses the third-party
claims of TPPs.

## BACKGROUND

The following facts are undisputed except as otherwise noted. They are drawn from the
Third-Party Complaint, Dkt. No. 60 ("Third-Party Complaint" or "Compl."); the declaration of
Michael Roopnarine, Dkt No. 123 at 3–9; and the exhibits attached to both.

## I.     The TPPs

DHNY is the owner of premises at 25-29 Nicholas Terrace, New York, New York (the
"Premises"). Compl. ¶ 3. Gemstone operates or manages the Premises. *Id.* ¶ 4. Salcedo is a
laborer who, on September 12, 2013, was performing construction services at the Premises. *Id.*
¶ 1. On that date, he sustained serious personal injuries when a heavy object was dropped by
another worker and fell on Salcedo while he was in the process of dismantling a boiler. *Id.* ¶¶ 1–
2.

_____

which is not a named third-party defendant in this action. Dkt. No. 123 ¶ 10. To avoid
confusion, the Court refers to Distinguished Programs Insurance Brokerage LLC as
"Distinguished Brokerage" and to Distinguished Programs Group, LLC as "Distinguished
Programs."

DHNY holds a commercial general liability insurance policy (the "Aspen Policy") issued to it as named insured by Aspen Specialty Insurance Company ("Aspen"). *Id.* ¶ 57. Gemstone also qualifies as a named insured to the Aspen Policy. *Id.* ¶ 58. The Aspen Policy had limits of $1 million per occurrence and $2 million in the aggregate, and was effective for the policy period September 11, 2013, to September 11, 2014. *Id.* ¶¶ 57; Dkt. No. 60-12. It included an endorsement establishing a "Designated Ongoing Operations" exclusion, which expressly excluded from coverage any "bodily injury" or "property damage" arising from "[a]ny construction or renovation-related activity except for janitorial or maintenance-related work performed by your own employees." Dkt. No. 60-12 at 51. The Aspen Policy was procured for DHNY and Gemstone by Third-Party Defendant O&S Insurance Brokerage Group Inc. ("O&S") who, with its successor Hub International Limited, acted as insurance agent and broker for DHNY and Gemstone. *Id.* ¶ 6–7.

## II.    The Distinguished Parties

Distinguished Properties is a risk purchasing group, created and operated pursuant to the Product Liability Risk Retention Act of 1981, as amended by the Liability Risk Retention Act of 1986, 15 U.S.C. §§ 3901–3906, that offers excess insurance coverage through numerous insurers who have agreed to provide coverage through a Master Policy to members of the Distinguished Properties risk purchasing group. Dkt. No. 123 ¶ 4. Distinguished Brokerage is the wholesale insurance broker for Distinguished Properties. *Id.* ¶ 5. Distinguished Brokerage works with retail brokers that seek excess insurance for their clients—prospective insureds—for classic real estate risks. *Id.* The Distinguished Parties enter contracts with insurers such as Great American Insurance Company ("Great American") that are interested in providing excess coverage to members of the Distinguished Properties risk purchasing group. *Id.* ¶ 6. Distinguished Parties

also enter into contracts with retail brokers, such as O&S, who represent prospective insureds seeking excess insurance coverage.  *Id.*

A retail broker seeking coverage for its client will complete and submit an application to Distinguished Brokerage.  *Id.* ¶ 7.  Distinguished Brokerage will then provide the retail broker with a quote (the terms and price for placing a risk with Distinguished Properties) based on guidelines set forth by the insurance companies with whom the Distinguished Parties have contracts.  *Id.*  Once the retail broker reviews and approves of the quote, a policy letter and certificate of coverage are issued by the participating insurers, which the retail broker again must review and approve on behalf of the potential insured before the insurance is bound.  *Id.*  In the process, the Distinguished Parties communicate only with the retail brokers; they do not contract with or communicate with the prospective insureds.  *Id.* ¶ 8.  The Distinguished Parties do not themselves underwrite the risk or issue insurance policies; rather, it is the insurance companies that contract with the insureds.  *Id.* ¶ 5.  Significantly for this case, Distinguished Properties offers policies only for real estate risk and has never offered or advertised for construction policies.  *Id.* ¶ 4.

In 2003, Distinguished Programs, the parent company of Distinguished Brokerage, entered into a brokerage agreement (the "2003 Brokerage Agreement") with Great American Custom Insurance Services, Inc. as part of the Distinguished Parties' risk-purchasing program. Dkt. No. 123 ¶ 10; Dkt. No. 123-1.  That agreement provided for Distinguished Programs to submit applications for insurance to Great American and for Great American to review such applications.  *Id.* ¶ 11

From 2013 to 2015, Great American was the lead excess insurer to members of the Distinguished Parties' risk purchasing group pursuant to a Commercial Umbrella Liability

Master Insurance Policy (the "Master Insurance Policy"), with a combined liability limit of $100,000,000.  Compl. ¶ 59; Dkt. No. 123 ¶¶ 4, 11, 13, 19; Dkt. Nos. 60-13–60-14, Dkt. No. 123-5.  As part of that Master Insurance Policy, Great American issued the first layer of excess coverage through a "Protector Commercial Umbrella" policy effective from September 1, 2013, to September 1, 2015, with liability limits of $10,000,000[2] for each occurrence and in the aggregate (the "Great American Policy").  Compl. ¶¶ 11, 60; Dkt. No. 123-5 at 5, 14.  Ironshore Indemnity Inc. ("Ironshore") was a participating carrier in connection with the Master Insurance Policy.  Compl. ¶ 10, Dkt. No. 123-5 at 5.  Ironshore provided the next layer of excess coverage under the Master Insurance Policy and issued a "Commercial Excess Liability Policy" effective September 1, 2013, to September 1, 2015, with limits of liability of $15,000,000[3] for each occurrence and in the aggregate (the "Ironshore Policy").  Compl. ¶¶ 12, 61; Dkt. No. 123-5 at 5, 71, 74.

## III.    The Relationship Between Distinguished Brokerage and O&S

Distinguished Brokerage and O&S are parties to a Retail Brokerage Agreement signed in 2007 as part of the Distinguished Properties' risk purchasing group.  Dkt. No. 123 ¶ 12.  The Retail Brokerage Agreement represents that Distinguished Brokerage is "an insurance broker engaged in the business of placing insurance risks with various insurance companies" and "is able to place insurance business with certain insurance carriers by virtues of its relationship with those carriers."  Dkt. No. 123-2 at 4.  The insurance carriers with whom Distinguished Brokerage has a relationship and is able to place insurance business are referred to as "Markets."  *Id.*  The Retail Brokerage Agreement recites that O&S, as broker, "desires to place insurance business

---

[2] The Third-Party Complaint reads "with limits of $10,0000."  *Id.* ¶ 60.  The Court understands this to be a typographical error.
[3] The Third-Party Complaint reads "with limits of $15,0000."  *Id.* ¶ 61.  The Court understands this to be a typographical error.

with [Distinguished Brokerage's] Markets, and also desires the services, underwriting facilities, knowledge, and specialized skills of [Distinguished Brokerage] in connection with the placement of insurance for [O&S's] customers." *Id.* Under the Retail Brokerage Agreement, O&S has the right, but not the obligation, to submit risks to Distinguished Brokerage for placement with Distinguished Brokerage's Markets. *Id.* ¶ 1(c). In turn, Distinguished Brokerage has the obligation to "use its best commercially reasonable efforts to obtain insurance from its Markets for risks submitted to it by [O&S]," provided that it has "no obligation to seek coverage with respect to those risks for which it believes coverage is unavailable, or with respect to which the financial incentive for making such a placement would not be sufficient." *Id.* ¶ 1(a). O&S has the obligation to collect and pay all insurance costs, including the premium, in connection with insurance placed under the agreement, *id.* ¶ 7(c), while Distinguished Brokerage has the right to cancel any binder, policy, or contract of insurance placed under the agreement in accordance with the cancellation provisions of such binder, policy, or contract, including for nonpayment of insurance costs, *id.* ¶ 8(a).

The relationship between Distinguished Brokerage and O&S is stated to be "that of independent contractors" and not a "relationship of principal and agent either between the parties hereto or between [Distinguished Brokerage] and [O&S's] customers." *Id.* ¶ 2. The Retail Brokerage Agreement states explicitly that Distinguished Brokerage "shall not be deemed an insurer and shall have no obligation whatsoever with respect to any loss, claim, damage or other injury incurred by any person in connection with the business subject to this Agreement. *Id.* ¶ 1(b). O&S, as broker, has the obligation to immediately notify Distinguished Brokerage "of all claims, suits, and notices of loss" arising under the insurance placed by Distinguished Brokerage while Distinguished Brokerage is required to "use its reasonable best efforts to notify its

Market(s) of such Loss, provided, however, that [Distinguished Brokerage] shall have no obligation to notify any other insurance carrier in connection therewith."  *Id.* ¶ 10.

## IV.    The Procurement of the Excess Policy on Behalf of TPPs

In or around September 2013, O&S Brokerage applied for excess layer commercial general liability insurance on behalf of DHNY and Gemstone, through Distinguished Programs and/or Distinguished Properties.  Compl. ¶ 8; Dkt No. 123 ¶ 14.  It did so through completion of a form application (the "Application"), Dkt. No. 123-3, submitted to Distinguished Brokerage, which is dated September 10, 2013*, id.*; Dkt. No. 123 ¶ 14.  The first page of the Application is headed: "Umbrella Application—For Community Associations, Apartment Rentals, Lessor Risk—Office, Light Industrial, Retail."  Dkt. No. 123-3 at 2.  The first three sections identify risks that do not qualify for the Distinguished Parties program.  Among other things, it states that "Buildings older than 25 years that have not had the Roof, HVAC, Plumbing, & electrical systems updated in the last 25 years" are not eligible.  *Id*.  The fourth section asks for the information necessary for Distinguished Brokerage to rate and quote the risk.  *Id.* at 5.

Distinguished Brokerage sent an email to O&S with a quote for an excess insurance policy in response to the Application on September 10, 2013.  Dkt. No. 123 ¶¶ 16–17.  The first page of the "Umbrella Quote" advised O&S, "Refer to the policy contract for specifics regarding terms, conditions and exclusions."  Dkt. No. 123-4 at 3.  The remaining pages contain "Umbrella Coverage Highlights," "Participating Insurance Carrier Schedule," and "Binding Information/Loss Control/Claims Information."  Dkt. No. 123-4 at 4–11.  The first page of the Umbrella Coverage Highlights contains a section heading underlined, in bold, and all capital letters:  "**IMPORTANT COVERAGE NOTES**."  The fifth bullet point under that heading states:

> Coverage is limited to real estate risks only and covers risk exposures usual and customary to the ownership, and/or management of real estate. Our purchasing group policy does not cover structural or ground up construction, nor real estate development operations. As respects commercial properties, coverage is limited to the lessor's risk ownership exposure only.

Dkt. No. 123-4 at 4.

A subsequent page listing the forms and endorsements states that coverage is for "Broad Named Insured Real Estate Owners—Lessors Risk Only." *Id.* at 5. Under the bolded and underlined heading, "**<u>Limitations</u>**," the Umbrella Quote repeats:

> Coverage is limited to real estate risks only and covers risk exposures usual and customary to the ownership, and/or management of real estate. Our purchasing group policy does not cover structural or ground up construction, nor real estate development operations. As respects commercial properties, coverage is limited to the lessor's risk ownership exposure only.

Dkt. No. 123-4 at 5.

The Umbrella Quote was valid for ninety days. *Id.* at 3. O&S was told that if it had questions, it could contact a representative of the Distinguished Parties at an email or telephone number that was provided. *Id.* O&S was told that it could bind the quote via a broker portal or by email to the Distinguished Parties. *Id.* O&S accepted the quote on behalf of the TPPs on September 11, 2013. Dkt. No. 123 ¶ 18.

## V.    The Excess Policy

On September 11, 2013, Distinguished Brokerage sent O&S a copy of the Invoice, Policy Letter, Certificate of Coverage, Certificate Holder Notice, Master Insurance Policy, and other accompanying policy documents. Dkt. No. 123 ¶ 18; Dkt. No. 123-5. The Policy Letter advises: "In order to accept this insurance and to ensure continuous coverage for the captioned named insured, you must review the attached documents and remit payment within 30 days of the coverage effective date, or a non-payment cancellation notice will be issued." Dkt. No. 123-5 at 4. O&S and its customers were offered that if they did not accept the terms and conditions of the

8

insurance or wished to make any change, they should contact Distinguished Brokerage.  *Id.*  The enclosed Certificate Holder Notice states, under a section heading underlined, in bold, and all capital letters, "**RISK ELIGBILITY [*sic*] REQUIREMENTS**":

> Coverage is limited to <u>real estate risks only</u> and covers risk exposures usual and customary to the ownership and/or management or real estate only.
>
> [. . .]
>
> There is **NO** planned or active structural/ground-up construction or real estate development.

*Id.* at 8.

As to the Master Insurance Policy itself, Item 1 of the "Declarations" page lists "Distinguished Properties Umbrella Managers, Inc.," i.e., Distinguished Properties, as the named insured with a policy period running from September 1, 2013, to September 1, 2015.  Dkt. No. 123-5 at 14.  The Master Insurance Policy also includes applicable endorsements.  Among those endorsements is GAI 6011, "Broad Named Insured Endorsement," with an edition date of 6/97. *Id.* at 15.  That endorsement reads that "[t]he Named Insured listed in Item 1 of the Declarations is changed to the following: All members of the Distinguished Property Umbrella Managers, Inc. risk purchasing group, as scheduled on the individual certificate of coverage and or the schedule of named insureds attached thereto."  Dkt. No. 123-5 at 61.  In turn, the Certificate of Coverage, which serves as evidence of coverage to members of the risk purchasing group, identifies "DHNY Gemstone Realty Partners" as the "Distinguished Properties Umbrella Managers Inc. Risk Purchasing Group Member."  Dkt. No. 123-5 at 5.

The endorsement GAI 7115, "Risk Purchasing Group Endorsement," with edition date 7/11, also modifies Section IV of the Umbrella Policy.  Dkt. No. 123-5 at 15, 35.  It adds that bodily injury or property damage is to follow form from the underlying insurance, i.e., the Aspen Policy in the case of DHNY/Gemstone.  *Id*. at 36.  The endorsement also expressly excludes "[a]ny

liability or loss, cost or expense arising out of: 1. The development, construction, or demolition of real property; or 2. The 'structural alteration' or addition of real property." *Id*. at 36.

## VI.    Underlying Action

On October 31, 2013, Salcedo filed suit against DHNY, Gemstone, Strathmore Construction Management, LLC ("Strathmore"), Sunation Thermal Services, Inc. ("Sunation"), and Sustainable Energy Options, LLC ("Sustainable") in New York State Supreme Court, Bronx County, for the injuries incurred by him on September 12, 2013 (the "Underlying Action"). Compl. ¶ 5; Dkt. No. 60-1.  He filed an amended complaint on August 19, 2015, to add DHNY as owner to the case, and a second amended complaint to correct a ministerial error in DHNY's name in the caption.  Compl. ¶ 5; Dkt. No. 60-1 at 20, 40.

The state Supreme Court granted DHNY, Gemstone, Strathmore, and Sustainable summary judgment by order entered on July 11, 2019.  Compl. ¶ 20.[4]  *See Luis Manuel Garcia Salcedo v. Sunation Thermal Services, Inc.*, 2019 WL 3531620, at *4 (N.Y. Sup. Ct. June 27, 2019).  On January 5, 2021, the New York State Supreme Court, Appellate Division, First Department, affirmed the dismissal of Strathmore but reversed the trial court's decision to grant summary judgment for DHNY, Gemstone, and Sustainable, holding that issues of fact remained as to whether they violated New York Labor Law § 240 and whether Salcedo's injuries were caused by those violations.  *Id.* ¶ 21; Dkt. No. 60-4; *see Salcedo v. Sustainable Energy Options, LLC*, 139 N.Y.S.3d 197, 199 (1st Dep't 2021).

## VII.    The Coverage Positions

On February 10, 2014, DHNY forwarded notice of the Underlying Action to O&S.  Dkt. Nos. 123 ¶ 22; 123-7.  On February 11, 2014, O&S forwarded notice of the Underlying Action to

---

[4] The claims against Sunation, which was not involved with performing or supervising Salcedo's work, were discontinued.  *Id.* ¶ 19.

Distinguished Programs to put Great American on notice as the first excess liability insurer.  Dkt. Nos. 123 ¶ 23; 123-8.  O&S asked that the Distinguished Parties "put Great American, the umbrella liability carrier on notice of this matter."  Dkt. No. 123-8 at 2.  That same day, after receiving notice from O&S, the Distinguished Parties notified Great American of the claims against DHNY.  Dkt. Nos. 123 ¶ 24; 123-8.

On February 24, 2014, DHNY's primary carrier, Aspen, disclaimed coverage for claims arising from the Underlying Action based on the "Designated Ongoing Operations" exclusion contained in the Aspen Policy.  Compl. ¶ 16; Dkt. No. 60-2; Dkt. No. 123-9.  On March 10, 2014, however, Sentinel Insurance Company ("Sentinel")—the underlying insurer for Sustainable, a consultant for DHNY—accepted the tender on behalf of DNHY and Gemstone.  Compl. ¶17; Dkt. No. 60-3.

On October 28, 2021, Great American issued a letter to DHNY and Gemstone disclaiming coverage for any loss resulting from the Underlying Action.  Compl. ¶ 22; Dkt. Nos. 60-5; 123-10.  Great American reported having been recently notified that the state court's grant of summary judgment had been reversed on appeal.  Dkt. No. 123-10 at 2.  It acknowledged receiving a copy of Aspen's disclaimer letter of February 24, 2014.  *Id.*  Great American disclaimed coverage on the grounds that the Great American Policy followed form as to the Aspen Policy with respect to the exclusions for bodily injury and that coverage was therefore excluded for any construction or renovation activities of the kind in which Salcedo was allegedly engaged when he was injured at the Premises.  Compl. ¶ 22; Dkt. No. 60-5.  On January 20, 2022, Ironshore disclaimed coverage for the same reasons.  Compl. ¶ 23; Dkt. No. 60-6; Dkt. No. 123-11.

## VIII.  The State Court Settlement

By correspondence dated March 8, 2023, counsel for Salcedo wrote to Aspen, Great American, and Ironshore that their disclaimers were invalid, asked that they be withdrawn, and

invited the insurers to negotiate a settlement in good faith within their policy limits.  Compl. ¶¶ 25–26; Dkt. No. 60-7.  In addition, counsel for Salcedo notified O&S that Salcedo reserved the right to pursue an errors and omission claim upon receiving an assignment of rights from DHNY and Gemstone.  Compl. ¶ 30; Dkt. No. 60-7.[5]  On March 29, 2023, Great American responded by maintaining its declination of coverage.  Compl. ¶ 31; Dkt. No. 60-8.  On April 27, 2023, Aspen responded by maintaining its declination of coverage.  Compl. ¶ 32; Dkt. No. 60-9.  By correspondence dated October 12, 2023, counsel for Salcedo again invited Aspen, Great American, Ironshore, O&S, and Distinguished Programs to engage in good faith settlement discussions.  Compl. ¶ 33; Dkt. No. 60-10.  No response was received.  Compl. ¶ 35.

On October 26, 2023, DHNY, Gemstone, and Sustainable settled the Underlying Action for $6 million on the eve of trial.  The settlement agreement provided that Sentinel, Sustainable's insurer, would be responsible for payment of the $1 million limits under its policy and Salcedo would receive an assignment of rights from DHNY and Gemstone to pursue the remaining $5 million from Aspen, Great American, Ironshore, O&S, and others.  Compl. ¶¶ 33–35; Dkt. No. 60-11.  The Assignment of Rights provides that DHNY and Gemstone assigned any claims or defenses they might have against:

> ASPEN INSURANCE COMPANY, GREAT AMERICAN INSURANCE COMPANY, IRONSHORE INDEMNITY INCORPORATED and THE O&S INSURANCE BROKERAGE GROUP, INC., and any other insurance company (except for Sentinel Insurance Company, Ltd. - referred to hereinafter as "the Hartford" - which is released to the extent discussed below) that provided or could have provided insurance coverage to Assignors arising out of the manner in which said entities (including, e.g., their brokers, employees, agents, and third-party claims administrators) provided insurance coverage, underlying insurance, excess insurance coverage, stacking insurance, concurrent insurance, and/or defense and/or indemnification, or submitted or otherwise handled claims for Assignors in

_____

[5] The Third-Party Complaint states that the letter put Distinguished Programs or Distinguished Properties on notice of the potential errors and omissions claim.  Compl. ¶ 30.  But the actual letter only puts O&S on notice of a errors and omissions claim.  Dkt. No. 60-7 at 12.

regard to a claim by LUIS GARCIA SALCEDO for personal injuries allegedly sustained on September 12, 2013 while in the course of allegedly providing construction services for Assignors, and/or in a cause of action entitled LUIS GARCIA SALCEDO v. STRATHMORE CONSTRUCTION MANAGEMENT, LLC, SUNATION THERMAL SERVICES, INCL, SUSTAINABLE ENERGY OPTIONS, LLC, GEMSTONE PROPERTY MANAGEMENT, LLC and DHNY APT IV, LLC, New York Supreme Court, Bronx County, Index 306568/2013E ("the Salcedo Action"), arising out of the accident dated September 12, 2013.

Dkt. Nos. 60-11 at 1; 123-12 at 2.

## PROCEDURAL HISTORY

On October 16, 2023, Great American filed suit in this Court against Gemstone and DHNY, seeking a declaratory judgment that it had no duty to defend either Gemstone or DHNY in connection with the Underlying Action. Dkt. No. 1. Great American acknowledged having received notice of the Underlying Action but stated that it had advised DHNY and Gemstone by letter of February 12, 2014, that they should contact Great American if DHNY or Gemstone believed that the loss warranted Great American's involvement. *Id.* ¶ 40. Great American alleged that DHNY and Gemstone did not contact it until July 15, 2021, when they relayed that the Underlying Action might subject Great American to exposure. *Id.* ¶¶ 44–45. Great American asserted that it had no duty to defend DHNY or Gemstone because the "Designated Ongoing Operations" Exclusion in the Aspen Policy barred coverage for bodily injuries arising out of the ongoing operations of any construction or renovation-related activity. *Id.* ¶ 54.

On January 29, 2024, Great American filed an amended complaint, adding Salcedo as a defendant and referring to the fact that the Underlying Action had been settled and discontinued as of December 14, 2023. Dkt. No. 15.

Gemstone, DHNY, and Salcedo answered on March 18, 2024, and filed a counterclaim alleging breach of contract by Great American in connection with Great American's failure to

provide coverage for Salcedo's claim and seeking damages in the amount of the outstanding settlement.  Dkt. No. 25.

On March 25, 2024, Gemstone, DHNY, and Salcedo as third-party plaintiffs filed a third-party complaint against Aspen, Ironshore, O&S, and the Distinguished Parties.  Dkt. No. 26.

On May 8, 2024, TPPs filed this amended Third-Party Complaint.  *See* Compl.[6]  The Third-Party Complaint asserts claims against Aspen, Ironshore, Distinguished Properties, Distinguished Brokers, and O&S.  TPPs seeks a declaration that Aspen and Ironshore are obligated to provide coverage for Salcedo's bodily injury claim and to pay compensatory damages in the form of interest and attorney's fees.  *Id.* ¶¶ 48–49.  They allege that the disclaimers by Aspen and Ironshore were untimely and invalid.  *Id.* ¶¶ 25, 27, 64–137.  TPPs also allege that, if the Court determines that Aspen and Ironshore do not owe a duty to indemnify and defend, that Distinguished Programs, Distinguished Brokerage, and O&S are liable for compensatory damages due to their errors and omissions in failing to provide or obtain coverage for DHNY and Gemstone.  *Id.* ¶ 50, 138–220.  The Third-Party Complaint attaches fifteen documents, including documents relating to the underlying action as well as the Aspen Policy and the Excess Policy.

Ironshore answered the Third-Party Complaint on July 24, 2024, Dkt. No. 92, and Aspen answered it on August 5, 2024, while also counterclaiming that it had no duty to defend or indemnify, Dkt. No. 98.  O&S answered the Third-Party Complaint on August 19, 2024.  Dkt. No. 104.

---

[6] TPPs attempted to file the amended third-party complaint on April 30, 2024.  Dkt. No. 51.  It was rejected by the Clerk of Court for a filing error.  *Id.*

On December 13, 2024, the Distinguished Parties filed this motion to dismiss, along with the declaration of Michael Roopnarine, Distinguished Brokerage's Senior Vice President, Risk and Compliance Manager, and a memorandum of law in support of the motion. Dkt. No. 123. Along with the motion to dismiss, the Distinguished Parties attached twelve documents. These included documents related to the 2003 Brokerage Agreement between the Distinguished Programs and Great American, the Excess Policy, correspondence between the parties, and relevant coverage disclaimers. *See* Dkt. Nos. 123-1–123-12.

TPPs filed a memorandum of law in opposition to the motion to dismiss on January 10, 2025. Dkt. No. 135. The Distinguished Parties filed a reply memorandum of law in further support of the motion to dismiss on January 31, 2025. Dkt. No. 139.[7]

On April 18, 2025, the Court gave notice to the parties, pursuant to Federal Rule of Civil Procedure 12(d), that it was considering converting the motion to dismiss into one for summary judgment. Dkt. No. 157. The Court gave TPPs until May 19, 2025, to present any additional materials pertinent to the motion. *Id.* No such materials were provided.

## LEGAL STANDARD

A court must convert a motion to dismiss to a motion for summary judgment when it "considers material outside of the pleadings that is not attached to the complaint, incorporated by reference, or integral to the complaint." *U.S. ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir. 2021); *see also* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated

---

[7] On December 30, 2024, the Court granted Great American's motion to file a Second Amended Complaint and Amended Answer and Affirmative Defenses to the Counterclaims, adding allegations of fraud against Salcedo. Dkt. No. 131. A Second Amended Complaint was filed on January 3, 2025. Dkt. No. 133. Discovery has now been extended to March 16, 2026. Dkt. No. 166.

as one for summary judgment under Rule 56.").  In these situations, the court must "give the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002).

Summary judgment is appropriate when "a movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  "An issue of fact is material for these purposes if it might affect the outcome of the suit under the governing law, while [a]n issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *UMB Bank, N.A. Bluestone Coke, LLC*, 2020 WL 6712307, at *3 (S.D.N.Y. Nov. 16, 2020) (citing *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000)) (internal quotations omitted).  The movant bears the burden of demonstrating that "no genuine issue of material fact exists," *id.* (citing *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002)), and "[i]n determining whether there are any genuine issues of material fact, the Court must view all facts 'in the light most favorable to the non-moving party,'" *id.* (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008)).

The opposing party may defeat a motion for summary judgment by "com[ing] forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  The opposing party may not rely on "mere speculation or conjecture as to the true nature of the facts" or "on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible."  *Saborit v. Harlem Hospital Auxiliary, Inc.*, 2021 WL 1063241, at *2 (S.D.N.Y. Mar. 19, 2021) (internal citations omitted).  Rather, the

opposing party may only establish a genuine issue of material fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).

## DISCUSSION

TPPs bring two causes of action against the Distinguished Parties: (1) breach of contract, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing by "failing to properly underwrite, procure, or otherwise obtain or provide adequate coverage" and by failing to ensure that Great American and Ironshore had timely notice, Compl. ¶¶ 138–67; and (2) fraudulent inducement and negligent misrepresentation, *id.* ¶¶ 168–200.

The Distinguished Parties argue that the two claims must be dismissed because: (1) TPPs are not party to any contract with the Distinguished Parties and the Distinguished Parties did not breach any duty owed to TPPs as third-party beneficiaries; (2) any claim for breach of fiduciary duty is duplicative of the flawed breach of contract claim; (3) the breach of contract and fiduciary duty claims are time-barred; (4) TPPs have not pleaded a claim for fraudulent inducement or negligent misrepresentation; and (5) the claim for fraudulent inducement or negligent misrepresentation is time-barred.

## I.    Breach of Contract and Breach of Fiduciary Duty

TPPs' first cause of action against Distinguished Parties is labelled "Breach of Contract – Distinguished Programs and Distinguished Properties."  Compl. at 17.  TPPs allege that, to the extent Great American or Ironshore successfully defend their disclaimers, they are able to do so because of errors and omissions by the Distinguished Parties.  *Id.* ¶ 139.  In particular, TPPs allege the Distinguished Parties "breached the express or implied contractual duties, fiduciary duties, and covenants of good faith and fair dealing owed to DHNY and Gemstone by failing to properly underwrite, procure, or otherwise obtain or provide adequate coverage."  *Id.* ¶ 159.  TPPs also allege that the Distinguished Parties "breached the express or implied contractual

duties, fiduciary duties, and covenants of good faith and fair dealing owed to DHNY, Gemstone, and O&S Brokerage by receiving payment for advising them about the coverage provided by the risk purchasing group but failing to properly, faithfully, or adequately do so." *Id.* ¶ 160.  They also allege that the Distinguished Parties violated contractual and fiduciary duties by failing to provide timely notice of Salcedo's claims to Great American and Ironshore.  *Id.* ¶ 161.

To state a claim for breach of contract under New York law, a plaintiff must plead "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Piuggi v. Good for You Prods. LLC*, 739 F. Supp. 3d 143, 167 (S.D.N.Y. 2024) (citing *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188–89 (S.D.N.Y. 2011)).  "To plead these elements, a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue." *Id.* (quoting *Ellington*, 837 F. Supp. 2d at 189) (internal citations omitted).

To state a claim for breach of fiduciary duty, "a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages directly caused by the defendant's misconduct." *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 204 (S.D.N.Y. 2008).

TPPs' claim fails for the most basic reason.  TPPs do not allege or establish any contractual duties they were owed by the Distinguished Parties or the breach of such duties, nor do they allege or establish any fiduciary relationship they enjoyed with the Distinguished Parties.

TPPs do not allege or establish that they were party to any contract with either of the Distinguished Parties from which a duty to procure insurance coverage for construction risks would arise.  *See* Compl. ¶¶ 141–144 (discussing contracts between the Distinguished Parties and Great American but not with TPPs).  Distinguished Brokerage had a contract with O&S, the Retail Brokerage Agreement, but the only parties to that contract were Distinguished Brokerage

and O&S.  Dkt. No. 123-2.  TPPs were not parties to the Retail Brokerage Agreement.  Likewise, Distinguished Programs was party to the 2003 Brokerage Agreement with Great American, but that agreement provided only for Distinguished Programs to submit applications for insurance to Great American and for Great American to review such applications.  Dkt. No. 123-1.  TPPs were not themselves parties to that contract.  *Id*.

TPPs allege that they were "third-party beneficiaries or intended third-party beneficiaries to the express or implied contracts between Distinguished Programs or Distinguished Properties" and Great American and/or Ironshore.  Compl. ¶¶ 143–144.  Under New York law, a third-party beneficiary "is one who has a 'right to performance' under a contract because 'the intention of the parties' to that contract was to afford the third party such a right."  *In re George Washington Bridge Bus Station Dev. Venture LLC*, 65 F.4th 43, 54 n.6 (2d Cir. 2023) (citing Restatement (Second) of Contracts § 302 (1981)); *Peb, Inc. v. Premium Merch. Funding 26, LLC*, 2025 WL 1802996, at *11 (S.D.N.Y. July 1, 2025) ("Under New York contract law, third-party beneficiaries of a contract have a right to enforce its terms when there is a clear intent to benefit the third party on the face of the contract.").  "Proving third-party beneficiary status requires that the contract terms 'clearly evidence[] an intent to permit enforcement by the third party in question.'"  *Travis v. Naviern Corp.*, 460 F.Supp.3d 269, 284 (E.D.N.Y. 2020) (quoting *Hillside Metro Assocs., LLC v. JP Morgan Chase Bank, Nat. Ass'n*, 747 F.3d 44, 49 (2d Cir. 2014)); *cf Whitaker v. On the Right Track Sys., Inc.*, 2022 WL 785058, at *7 (S.D.N.Y. Mar. 14, 2022) ("While a 'contract may benefit a third-party . . . that does not in itself establish enforcement rights in that third party.'" (quoting *Dormitory Auth. v. Samson Constr. Co.*, 94 N.E.3d 456, 460 (N.Y. 2018))), *aff'd*, 2023 WL 406207 (2d Cir. Jan. 26, 2023).  To prevail on a breach of contract claim, a third-party beneficiary must (1) demonstrate the existence of a binding

agreement between the other parties, (2) that the contract was intended for its benefit, and (3) that the benefit to it is sufficiently immediate to indicate the assumption by the contracting parties of a duty to compensate it if the benefit is lost. *See Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011). TPPs do not identify a contract with Great American and/or Ironshore to which they were a third-party beneficiary. It could not have been the Retail Brokerage Agreement between Distinguished and O&S. That agreement provided no benefits to TPPs; rather, it set a framework for the working relationship between O&S and the Distinguished Parties. For example, the Retail Brokerage agreement defines the fee structure between the parties. Dkt. No. 123-2 at 5. It also sets forth policies for advertising, cancellation, and notification of claims. *Id*. at 7–8. There is no evidence that the parties to the Retail Brokerage Agreement intended to confer benefits to TPPs or permit enforcement by them. Such evidence may include express contractual language "stating that the contracting parties intended to benefit a third party by permitting that third party 'to enforce [a promisee's] contract with another.'" *Dormitory Auth.*, 94 N.E.3d at 460 (citing *Port Chester Elec. Co. v. Atlas*, 357 N.E.2d 983, 986 (N.Y. 1976)). It may also include a "contractual requirement that the promisor render performance directly to the third party" or some evidence that "no one other than the third party can recover if the promisor breaches the contract." *Debary v. Harrah's Oprating Co., Inc.*, 465 F. Supp.2d 250, 263–64 (S.D.N.Y. 2006) (internal citations omitted). No such rights are apparent on the face of the Retail Brokerage Agreement or the 2003 Brokerage Agreement. The breach of contract claim fails for that reason alone.

TPPs also do not allege any fiduciary relationship they enjoyed with either Distinguished Brokerage or Distinguished Properties. "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters

within the scope of the relation."  Restatement (Second) of Torts § 874 (1979).  A fiduciary

relationship is more than a conventional business relationship.  *See DiTolla v. Doral Dental IPA*

*of N.Y., LLC*, 953 N.Y.S.2d 155, 156 (2nd Dep't 2012).  A plaintiff must show "special

circumstances" that "transformed the parties' business relationship to a fiduciary one, such as

control by one party of the other for the good of the other."  *Id*.  "New York courts typically

focus on whether one person has reposed trust or confidence in another who thereby gains a

resulting superiority or influence over the first."  *Litton Industries, Inc. v. Lehman Bros. Kuhn*

*Loeb Inc.*, 767 F. Supp. 1220, 1231 (S.D.N.Y.1991), *rev'd on other grounds*, 967 F.2d 742 (2d

Cir. 1992).

TPPs do not make any allegations or identify any facts suggestive of a relationship of

trust and confidence as between TPPs and the Distinguished Parties.  "Under New York law,

insurance brokers 'have a common-law duty to obtain requested coverage for their clients within

a reasonable time or inform the client of the inability to do so; however, they have no continuing

duty to advise, guide or direct a client to obtain additional coverage."  *Pilkinton N.A., Inc. v.*

*Mitsui Sumitomo Ins. Co. of Am.*, 420 F. Supp.3d 123, 136 (S.D.N.Y. 2019) (citing *Am. Bldg.*

*Supply Corp. v. Petrocelli Grp., Inc.*, 979 N.E.2d 972, 974 (N.Y. 2012)).  If a "special

relationship" develops between the broker and client, "the broker may be liable, even in the

absence of a specific request, for failing to advise or direct the client to obtain additional

coverage."  *Id.* (quoting *Voss v. Neth. Ins. Co.*, 985 N.E.3d 823, 828 (N.Y. 2014) (internal

citations omitted)).  Such a relationship may be created where "(1) the agent receives

compensation for consultation apart from payment of the premiums, (2) there was some

interaction regarding a question of coverage, with the insured relying on the expertise of the

agent, or (3) there is a course of dealing over an extended period of time which would have put

objectively reasonable insurance agents on notice that their advice was being sought and specially relied on." *Id.* (quoting *Murphy v. Kuhn*, 682 N.E.2d 972, 975–76 (N.Y. 1997)).

The Distinguished Parties were not TPPs' insurance broker. TPPs' broker was O&S. Distinguished Properties is not a broker at all, but rather a risk purchasing group. Dkt. No. 123 ¶ 4. Distinguished Brokerage is a wholesale broker. Dkt. No. 123 ¶ 5. Distinguished Parties' only relationship with TPPs was through O&S, and their relationship with O&S was at arms-length. Under the Retail Brokerage Agreement, the relationship between Distinguished Brokerage and O&S was "that of independent contractors" and not that of "principal and agent." Dkt. No. 123-2 ¶ 2. Distinguished Brokerage was not "party to any arrangement or agreement between [O&S]" and its customers for any fee or compensation and was given neither "rights or obligations in connection therewith." *Id.* ¶ 5(b). It assumed "no obligation whatsoever with respect to any loss, claim, damage or other injury incurred by any person [including TPPs] in connection with the business subject to the [Retail Brokerage Agreement]." *Id.* ¶ 1(b). The Retail Brokerage Agreement made clear that it did not create a relationship of principal and agent between either the Distinguish Parties and O&S or between the Distinguished Parties and O&S's customers, and that O&S was the representative of the customers. *Id.* ¶ 2. "[W]here parties, particularly sophisticated ones . . . have undertaken certain obligations—and at the same time expressly limited those obligations—the courts should not normally interfere with those choices." *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.*, 1997 WL 685334, at *5 (S.D.N.Y. Nov. 4, 1997), *aff'd*, 149 F.3d 134 (2d Cir. 1998). Although "contractual agency disclaimers are not always dispositive, and a court may look to the facts and circumstances to determine whether an agent-principal relationship existed," *St. Francis Holdings, LLC v. MMP Capital, Inc.*, 2022 WL 991980, at *10 (E.D.N.Y. Mar. 31, 2022), here, the rest of the contract

and the course of dealing between O&S and Distinguished Parties corroborates the agency disclaimer.  There is no evidence in the record that Distinguished Parties provided advice with respect to coverage to the TPPs or had any course of dealing with them.  Its sole role was to receive an application from O&S which named DHNY and Gemstone and to convey to O&S a Quote for DHNY and Gemstone.  The documents exchanged between those parties establish that it was O&S's obligation to read the policies before deciding whether to sign and agree to them on behalf of DHNY and Gemstone.  In the absence of a duty, there can be no breach of that duty. *See Friesel v. Bank of America, N.A.*, 2025 WL 1224831, at *3 (S.D.N.Y. Apr. 24, 2025) (citing *Martinez v. City of New York,* 935 N.Y.S.2d 45, 47 (2d Dep't 2011)).

TPPs' claim appears to be founded on the assumption that the Distinguished Parties were the insured on the Excess Policy and that, through their role as insured, the Distinguished Parties undertook obligations to DHNY and Gemstone.  TPPs also allege that "Distinguished Properties or Distinguished Programs acted as the agents for the members and participating insurers of the risk purchasing group," Compl.¶ 146, and "as the underwriter for the members and participating insurers of the risks purchasing group," *id.* ¶ 147.  The first argument, however, is based on a faulty premise.  Distinguished Properties was not the named insured under the Excess Policy. While the Declarations Page in the Master Policy lists the named insured as Distinguished Properties Umbrella Managers, Inc., Dkt. No. 123-5 at 14, that listing is superseded by the endorsement states that the named insured is "[a]ll members of the Distinguished Properties Umbrella Managers, Inc., risk purchasing group, as scheduled on the individual certificate of coverage and or the schedule or named insureds attached thereto."  *Id*. at 61.  "It is settled that in construing an endorsement to an insurance policy, the endorsement and the policy must be read together, and the words of the policy remain in full force and effect except as altered by the

words of the endorsement." *County of Columbia v. Continental Ins. Co.*, 83 N.Y.2d 618, 628 (N.Y. 1994) (internal citations omitted)*; see also Liberty Surplus Ins. Corp. v. Segal Co.*, 142 Fed.Appx. 511, 515 (2d Cir. 2005) ("Consistent with the traditional canons of contractual interpretation, we reject a construction of the agreements that would render the [endorsement] meaningless, and, to the extent that the [endorsement] potentially conflicts with the Declarations, the plain language of the [endorsement] is controlling."); *Birnbaum v. Jamestown Mut. Ins. Co.*, 83 N.E.2d 128, 131 (N.Y. 1948) ("It is a familiar rule that in construing an indorsement to an insurance policy the indorsement and policy must be read together and that the policy remains in full force and effect except as altered by the words of the indorsement.").  Furthermore, the Schedule of Locations lists "DHNY Gemstone" as the insured.  Dkt. No. 123-5 at 10.  The email from Distinguished to O&S attaching the Excess Policy, Invoice, and related documents also refers to "DHNY Gemstone" as the insured.  Dkt. No. 123-5 at 2.

The only duties the Distinguished Parties could have owed were those identified by their contract with O&S—the obligation to O&S to "use its best commercially reasonable efforts to obtain insurance from its Markets for risks submitted to it by [O&S]," Dkt. No. 123-2 ¶ 1(a), and the obligation to "use its reasonable best efforts to notify its Market(s) of such Loss, provided, however, that [Distinguished Brokerage] shall have no obligation to notify any other insurance carrier in connection therewith," *id.* ¶ 10.  There is no evidence or allegation that the Distinguished Parties violated those duties.  The Application to Distinguished Brokerage did not request a policy that covered construction risks.  *See* Dkt. 123-3.  And the Excess Policy that DHNY and Gemstone were offered covered real estate risks and did not cover construction risks, as the Umbrella Quote itself made clear.  *See* Dkt. No. 123-4 at 4 ("[c]overage [would be] limited to real estate risks only" and the "purchasing group policy does not cover structural or

ground up construction, nor real estate development operations"). "An insured has the duty to read the insurance policy or have it read to him or her, as well as the duty to correct any inaccuracies present on the insurance application." *Jin Chai-Chen v. Metro. Life Ins. Co.*, 141 N.Y.S.3d 41, 43 (1st Dep't 2021). It is clear from the face of the Excess Policy, as well as previous correspondence between O&S and Distinguished, that construction injuries were not covered. The Distinguished Parties therefore discharged their duties with respect to the offering of coverage under the Retail Brokerage Agreement. And, as to the notification of the loss, the undisputed evidence establishes that the Distinguished Parties did just what they were asked. They notified the carrier they were asked to notify at the time they were told to notify the carrier.

TPPs do not assert a separate cause of action for breach of fiduciary duty; rather, the claim is embedded within the breach of contract claim. "'Where a fiduciary duty is based upon a comprehensive written contract between the parties, a claim for breach of fiduciary duty is duplicative of a claim for breach of contract' and must be dismissed." *Uni-World Cap., L.P. v. Preferred Fragrance, Inc.*, 43 F. Supp. 3d 236, 244 (S.D.N.Y. 2014) (quoting *Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Publ'g Co.*, 580 F.Supp.2d 285, 294–95 (S.D.N.Y. 2008)). "A breach of fiduciary duty claim is duplicative when it is based on allegations of fiduciary wrongdoing that are expressly raised in plaintiff's breach of contract claim." *Northern Shipping Funds I, LLC v. Icon Capital Corp.,* 921 F.Supp.2d 94, 105 (S.D.N.Y. 2013).

The Distinguished Parties argue that because the breach of fiduciary duty claim is not pled as a standalone claim, it is duplicative of the breach of contract claim and must be dismissed. Dkt. No. 123 at 30; Dkt. No. 139 at 9. The TPPs respond that the Distinguished Parties breached the contract because the insurance was "wholly inadequate," *and* the Distinguished Parties breached duties "existing beyond and separate to this agreement as well."

Dkt. No. 135-1 at 15.  TPPs assert that these duties stem from the fact that the named insured on the Master Insurance Policy is "none other than Distinguished."  *Id.* at 10.  But, as set out above, the named insured on the Excess Policy is not Distinguished, but rather DHNY/Gemstone.  Dkt. No. 123-5 at 61.  TPPs do not offer any other reason why the Distinguished Parties might owe them a fiduciary duty.

Accordingly, judgment is granted for the Distinguished Parties on the TPPs' claim for breach of contract and breach of fiduciary duty.

## II.   Fraudulent Inducement and Negligent Misrepresentation

The TPPs' second cause of action against Distinguished Parties is labelled "Fraudulent Inducement and Negligent Misrepresentation – Distinguished Programs and Distinguished Properties."  Compl. at 21.  TPPs allege that the Distinguished Parties "negligently misrepresented to DHNY and Gemstone, or their agent, that DHNY and Gemstone's intended use of the Premises would be covered by the policies issued by the participating insurers to the risk purchasing group."  Compl. ¶ 185.  Further, they argue that "DHNY and Gemstone were fraudulently induced by the negligent misrepresentations of Distinguished Programs or Distinguished Properties [to] procure the insurance policies underwritten by Distinguished Programs or Distinguished Properties, including the Great American Policy and Ironshore Policy."  *Id.* ¶ 190.

"Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the

plaintiff reasonably relied on it to his or her detriment." *Hydro Invs., Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 20 (2d Cir. 2000).

"To state a claim for fraud or inducement under New York law, a party must allege material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff, and damages." *Transnat'l Mgmt. Sys. II, LLC v. Carcione*, 2016 WL 7077040, at *5 (S.D.N.Y. Dec. 5, 2016). Statements that amount to "little more than mere puffery, opinions of value or future expectations . . . do not constitute actionable fraud." *Elghanian v. Harvey*, 671 N.Y.S.2d 266, 266 (1st Dep't 1998). Claims for fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which require that fraud be pled "with particularity." Fed. R. Civ. P. 9(b). To comply with Rule 9(b)'s heightened pleading requirements, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks and citation omitted).

TPPs neither allege nor offer evidence to support that the Distinguished Parties made any false representations to them or to any other party. The Distinguished Parties made no representations at all to DHNY or to Gemstone.

A false statement made by the defendant and conveyed to the plaintiff by a third party can give rise to a claim for fraud under two circumstances. *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 2020 WL 5518146, at *84 (S.D.N.Y. Sept. 14, 2020).

First, a fraud claim may arise where the defendant makes a false or misleading statement to an intermediary, intending it to be conveyed to the plaintiff and it is so conveyed. *See Peerless Mills, Inc. v. Am. Tel. & Tel. Co.*, 527 F.2d 445, 451 (2d Cir. 1975); *Pasternack v.*

*Laboratory Corp. of America Holdings*, 59 N.E.3d 485, 492–493 (N.Y. 2016). "In order to establish a claim under the line of cases identified in *Pasternack*, it is critical that (1) the defendant be the source of the false and misleading statement or information conveyed to the plaintiff; and (2) the defendant intends and knows that the information will be conveyed to the plaintiff." *Fin. Guar. Ins. Co.*, 2020 WL 5518146, at *84 (citing *Pasternack*, 59 N.E.3d at 492–93).

Second, a fraud claim may arise where the defendant has "so 'entangled itself' with the issuance of" a document that false statements therein "may, in effect, be attributed to the [defendant]," *In re ICN/Viratek Sec. Litig.*, 1996 WL 164732, at *3 (S.D.N.Y. Apr. 9, 1996) (citation omitted), or constitute "an implied representation [from the defendant] that the information" being conveyed "is true or at least in accordance with the [defendant's] views," *Fin. Guar. Ins. Co.*, 2020 WL 5518146, at *84 (citing *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir. 1980)); *see In re N. Telecom Ltd. Sec. Litig.*, 42 F. Supp. 2d 234, 249 (S.D.N.Y. 1998) ("Indicia of entanglement may include a corporation's review, correction and approval of a final version the analyst's report."); *see also Aris Multi-Strategy Offshore Fund, Ltd. v. Devaney*, 907 N.Y.S.2d 98 (Sup. Ct. 2009) (citing *Elkind* as applicable to common law fraud claim); *Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 696 (S.D.N.Y. 2012) ("The elements of common law fraud are substantially identical to the elements of a Section 10(b) claim."), *aff'd*, 548 F. App'x 16 (2d Cir. 2013). To establish liability under the "entanglement" theory, "the plaintiff need not establish that the defendant alone is the source of the conveyed false and misleading information but it is essential to show that the defendant had a 'level of involvement' with the allegedly fraudulent communication that is

sufficient to 'indicate entanglement.'" *Fin. Guar. Ins. Co.*, 2020 WL 5518146, at *86 (quoting *S.E.C. v. Wellshire Sec., Inc.*, 773 F. Supp. 569, 573 (S.D.N.Y. 1991)).

The Court assumes without expressly deciding that the Distinguish Parties either intended their statements to be conveyed to the TPPs, and they were so conveyed, or that Distinguished Parties' statements were "entangled" in O&S's statements to the TPPs. Regardless, the TPPs have not alleged or offered evidence that the Distinguished Parties either originated a false statement conveyed to the TPPs or were involved in a false statement conveyed to the TPPs. The Distinguished Parties stated over and over that its program covered only real estate risks and not construction risks. The Distinguished Parties stated as much multiple times in the Umbrella Quote and in the Excess Policy itself. *See, e.g.,* Dkt. No. 123-4 at 4 ("Coverage is limited to real estate risks only and covers risk exposures usual and customary to the ownership, and/or management of real estate. Our purchasing group policy does not cover structural or ground up construction, nor real estate development operations. As respects commercial properties, coverage is limited to the lessor's risk ownership exposure only."); *id.* at 5 (same); Dkt. No. 123-5 at 8 ("Coverage is limited to real estate risks only and covers risk exposures usual and customary to the ownership and/or management or real estate only . . . There is NO planned or active structural/ground-up construction or real estate development."); *id.* at 36 (disclaiming coverage for "the development, construction, or demolition of real property" or "the 'structural alteration' or addition of real property").

TPPs' claim also cannot survive on a theory of fraudulent omission. A party has a duty to disclose in one of three circumstances: "(1) the parties are in a fiduciary relationship; (2) under the special facts doctrine, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge; or (3) where a

party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure." *Fin. Guar. Ins. Co.*, 2020 WL 5518146, at *88 (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 582 (2d Cir. 2005) (citations omitted)); *see also Miele v. Am. Tobacco Co.*, 770 N.Y.S.2d 386, 391 (2d Dep't 2003) ("New York recognizes a cause of action to recover damages for fraud based on concealment, where the party to be charged has superior knowledge or means of knowledge, such that the transaction without disclosure is rendered inherently unfair.").

The TPPs have made no allegation and offered no evidence that would support a fraudulent omission claim under any of those theories. For the reasons already stated, the Distinguished Parties were in an arms-length relationship with the TPPs. They owed no duties to DHNY and Gemstone, who were O&S's clients. They also did not possess superior knowledge that would impose a duty to disclose. Distinguished Brokerage was a wholesale broker; it had the knowledge of the Great American Policy that was conveyed to it from Great American. O&S was a retail broker. Before DHNY and Gemstone were covered by the Great American Policy by way of the "tower of excess insurance" making up the Excess Policy, they were conveyed a copy of the Great American Policy and given an opportunity to review it. Dkt. No. 123 ¶ 9. The knowledge and sophistication of O&S, as the agent of DHNY and Gemstone, is imputed to DHNY and Gemstone. *See Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829 (N.Y. 1985) ("The general rule is that knowledge acquired by an agent acting within the scope of his agency is imputed to his principal and the latter is bound by such knowledge although the information is never actually communicated to it."). Finally, there was no ambiguity in Distinguished Parties' statements that would need to be clarified by a statement that construction

risks were not covered.  The Umbrella Quote and the Excess Policy both made clear that

construction risks were not covered.  *See* Dkt. No. 123-4 at 4, 5; Dkt. No. 123-5 at 8, 36.

Finally, the TPPs' claim for negligent misrepresentation and fraudulent inducement fails

because the TPPs do not allege and cannot prove reasonable reliance.  "Under New York law,

courts may determine 'as a matter of law that a party's reliance [is] unreasonable where the

alleged misrepresentation is explicitly contradicted by the written agreement.'"  *Phoenix*

*Companies, Inc. v. Concentrix Ins. Admin. Solutions Corp.*, 554 F. Supp. 3d 568, 595 (S.D.N.Y.

2021) (quoting *Robinson v. Deutsche Bank Tr. Co. Americas*, 572 F. Supp. 2d 319, 323

(S.D.N.Y. 2008)).  "When . . . the contract states that a contracting party disclaims the existence

of or reliance upon specified representations, that party will not be allowed to claim that he was

defrauded into entering the contract in reliance on those representations."  *Mfrs. Hanover Tr. Co.*

*v. Yanakas,* 7 F.3d 310, 315 (2d Cir. 1993).  Moreover, the Excess Policy contains a merger

clause, stating: "By acceptance of this policy, the 'Insured' agrees that the statement in the

application are the 'Insured's' representations and that this policy embodies all agreements

existing between the Insured and the Company relating to this insurance."  Dkt. No. 123-5 at 44.

The existence of such clauses would not necessarily be dispositive of the TPPs' fraudulent

inducement or negligent misrepresentation claims.  *See, e.g., Century Pac., Inc. v. Hilton Hotels*

*Corp.,* 2004 WL 868211, at *6 (S.D.N.Y. Apr. 21, 2004) ("Under New York law, a general

merger clause precludes neither an action for fraud in the inducement nor parol evidence

concerning fraudulent representations."); *DiFillippo v. Hidden Ponds Assocs.*, 537 N.Y.S.2d 222,

223 (2d Dep't 1989) ("It is well settled that a general merger clause is ineffective to exclude

parol evidence of fraud in the inducement.").  However, the TPPs do not plead or offer evidence

of any facts suggesting that the Distinguished Parties made any representations to them besides

what is contained in the Excess Policy.  Accordingly, judgment is granted for the Distinguished Parties on the TPPs' claims for fraudulent inducement and negligent misrepresentation.

## III.    Salcedo's Claims

The Distinguished Parties argue, as an alternative basis for dismissal, that Salcedo lacks standing to bring claims against them because (1) he is not an insured, and Insurance Law § 3420 only applies after a judgment has been awarded against the insured and even then applies only with respect to insurance companies; and (2) Salcedo was not assigned any rights against the Distinguished Parties.  Dkt. No. 123 at 38–39.  TPPs argue that Salcedo has standing to bring these claims against the Distinguished Parties both because he has standing pursuant to Insurance Law § 3420 and because "Defendants DHNY and Gemstone assigned their contractual rights under the insurance policy with Aspen, Great American, and Ironshore to . . . Salcedo."  Compl. ¶¶ 156–57, 182.  TPPs do not respond substantively to the Distinguished Parties' arguments. Instead, they simply reassert that Salcedo has standing because the allegations against the Distinguished Parties "impact[] Salcedo and his rights assigned under the settlement agreement directly."  Dkt. No. 135-1 at 16.  "[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims."  *Jackson v. Federal Exp.*, 766 F.3d 189, 195 (2d Cir. 2014).  TPPs' bare assertion that Salcedo's rights are impacted by this litigation does not constitute an effective response to the Distinguished Parties' points relating to Salcedo's standing; TPPs' argument is therefore deemed abandoned.

## IV.    Statute of Limitations

The Distinguished Parties also argue that even if TPPs' claims had merit, they would nonetheless be barred by the applicable statutes of limitations.  Most, but not all, of TPPs' claims would be barred by the statutes of limitations, were they to have merit.

The statute of limitations for breach of contract claims in New York is six years. *See* N.Y. C.P.L.R. 213(2); *Miller v. Metropolitan Life Ins. Company*, 979 F.3d 118, 121 (2d Cir. 2020). "Unless the contract provides otherwise, a cause of action for breach of an insurance contract accrues at the time of breach under New York law." *Fabozzi v. Lexington Ins. Co.*, 601 F.3d 88, 93 (2d Cir. 2010). The statute of limitations for breach of fiduciary duty claims is three years where, as here, the remedy sought is monetary. *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139–40 (N.Y. 2009). The statute of limitations for breach of fiduciary duty accrues "when all the elements of the tort can be truthfully alleged in a complaint." *Ganzi v. Ganzi*, 123 N.Y.S.3d 574, 575–76 (1st Dep't 2020) (internal citations omitted).

The Third-Party Complaint can be understood to allege two separate breaches of contract and/or breaches of fiduciary duty. The first such breach would be the failure to obtain an insurance policy that would cover construction risks, which could have occurred no later than the September 2013 effective date of the Excess Policy. Compl. ¶¶ 60–61, 159; Dkt. No. 123 ¶¶ 17–20; Dkt. No. 123-5. The second such breach would be the failure to provide timely notice of Salcedo's claim or lawsuit to Great American and Ironshore. Compl. ¶ 161.

Though TPPs conspicuously fail to plead the dates on which the latter breach would have occurred, such a duty to notify might have arisen either shortly after Salcedo's claim was first filed in October 2013, *id.* ¶ 5, or, as TPPs urge in their briefing, after the Appellate Division decision reversing the grant of summary judgment in favor of DHNY, Gemstone, and Sustainable in January 2021, *id.* ¶ 21; Dkt. No. 135-1 at 13.

The TPPs do not dispute that, to the extent they would proceed on the theories of breach of contract stemming from actions taken or not taken in 2013 or 2014, those claims are time-

barred.  Dkt. 135-1 at 12–14 (not disputing claims are time-barred but arguing only that there is a timely claim for failure to provide renewed notification).  This lawsuit was not filed against the Distinguished Parties until May 8, 2024.  To the extent TPPs allege a breach with respect to the failure to provide renewed notice in 2021, that claim is not time-barred but is nonetheless meritless.  As discussed above, the Distinguished Parties had only the duty to provide the notice that O&S asked them to make.  *See* Dkt. No. 123-2 ¶ 10 ("Broker shall immediately notify [Distinguished Brokerage] in writing of all claims, suits, and notices of loss . . . arising under insurance placed by [Distinguished Brokerage] pursuant to this Agreement, [Distinguished Brokerage] shall use its reasonable best efforts to notify its Market(s) of such Loss, provided, however, that [Distinguished Brokerage] shall have no obligation or duty to notify any other insurance carrier in connection therewith.").  The Distinguished Parties discharged their obligations as to notice in February 2014, when they provided notice of the potential claim to Great American on the same day they received notice from O&S.  Dkt. No. 123-8.  TPPs neither plead nor provide evidence that O&S asked Distinguished to provide renewed notice in 2021, nor have they established that Distinguished had such duties with respect to renewed notice.

The elements of a breach of fiduciary duty claim are "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct."  *Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216, 241 (2d Cir. 2020).  The latest possible date that this claim could have accrued is October 2021, when Great American disclaimed coverage, because this would be when TPPs' damages relating to the Excess Policy became identifiable and quantifiable.  *See IDT Corp.*, 907 N.E.2d at 273 ("As with other torts in which damage is an essential element, the [breach of fiduciary duty] claim is not enforceable until damages are sustained.") (internal quotations omitted).  Because the breach of

fiduciary duty claim was brought on May 8, 2024—two years and six months later—the claim is timely but regardless fails on the merits for the reasons set forth above.

The TPPs' claims for negligent misrepresentation and fraudulent inducement are time-barred. "Claims of negligent misrepresentation are 'subject to a three-year limitations period, unless the claim is grounded upon essential allegations of actual or constructive fraud, in which case the claim is governed by a six-year limitations period.'" *BankUnited, N.A. v. Merritt Env't Consulting Corp.*, 360 F. Supp. 3d 172, 184 (S.D.N.Y. 2018) (quoting *N.Y. State Workers' Comp. Bd. v. Comp. Risk Managers, LLC*, 67 N.Y.S.3d 792, 802 (Sup. Ct. 2017)). The statute of limitations for negligent misrepresentation accrues on the date of the alleged misrepresentation relied upon by the plaintiff. *See Board of Managers of Cipriani Club Residences at 55 Wall Condominium v. Howard L. Zimmerman Architects & Engineers DPC*, 219 N.Y.S.3d 266, 268 (1st Dep't 2024). Generally speaking, "[c]laims of negligent misrepresentation are 'subject to a three-year limitations period, unless the claim is grounded upon essential allegations of actual or constructive fraud, in which case the claim is governed by a six-year limitations period.'" *BankUnited*, 360 F. Supp. 3d at 184. The TPPs allege that "Distinguished Programs or Distinguished Properties negligently misrepresented to DHNY and Gemstone, or their agent, that DHNY and Gemstone's intended use of the Premises would be covered by the policies issued by the participating insurers to the risk purchasing group," *id.* at ¶ 185, and that such representations "fraudulently induced" DHNY and Gemstone to "procure the insurance policies underwritten by Distinguished Programs or Distinguished Properties, including the Great American Policy and Ironshore Policy," *id.* ¶ 190. The latest that such representations could have taken place was in 2013, prior to the September 2013 effective date of the Excess Policy. As a result, TPPs' claim

would be barred by the statute of limitations regardless of whether the three- or six-year statute of limitations period were to apply.

The statute of limitations for fraudulent inducement is the greater of six years from the date the cause of action accrued or two years from the time the plaintiff discovered the fraud or could with reasonable diligence have discovered it.  *See* N.Y. C.P.L.R. 213(8).  "As a general rule, under § 203(a), a claim for fraudulent inducement in the execution of an agreement 'accrues upon the execution of the agreement,' i.e., the time the fraud was committed."  *Von Hoffmann v. Prudential Ins. Co. of Am.*, 202 F. Supp. 2d 252, 262 (S.D.N.Y. 2002) (citing *In re Estate of Blake*, 723 N.Y.S.2d 563, 564 (3d Dep't 2001)).  The contract for the Excess Policy was executed in 2013.  The absolute latest date upon which the alleged fraud could have been "discovered" was in 2021 when Great American disclaimed coverage.  Accordingly, the claim for fraudulent inducement is time barred under either theory.

## CONCLUSION

The Court GRANTS summary judgment in favor of Distinguished Parties.

The Clerk of Court is respectfully directed to close Dkt. No. 123.

SO ORDERED.

Dated: August 1, 2025
New York, New York

_____
LEWIS J. LIMAN
United States District Judge